UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BANKESB,

                        **Plaintiff,**

        - against -

WEBSTER BANK, N.A.,

                        **Defendant.**

24-cv-8268 (JGK)

MEMORANDUM OPINION
AND ORDER

---

**JOHN G. KOELTL, District Judge:**

The plaintiff, BankESB ("ESB"), purchased a participation interest in a leasehold mortgage loan from the defendant, Webster Bank, N.A. ("Webster"), as successor-in-interest to Sterling National Bank.[1] ESB alleges that Webster misrepresented the ownership structure of certain parties to the underlying transaction to induce ESB into purchasing the participation interest. According to ESB, Webster's misrepresentation obscured the mortgage loan's true loan-to-value ratio and thus its risk. ESB also alleges that Webster breached the contract governing the participation interest (the "Participation Agreement") by failing to monitor the borrowers' tax liability and by releasing the borrowers from certain requirements intended to ensure that they continued servicing the loan. ESB now seeks rescission of

---

[1] In early 2020, Webster merged with Sterling. Webster assumed all Sterling's rights and responsibilities for purposes of this litigation. See Compl. at 1 n.1, ECF No. 1-1. For the sake of convenience, the Court refers to both Webster Bank and Sterling National Bank as "Webster."

the Participation Agreement or, in the alternative, damages for Webster's alleged breach of contract. The defendants move pursuant to Rule 12(b)(6) to dismiss the complaint in its entirety. For the following reasons, that motion is **granted.**

## I.

Unless otherwise noted, the following facts are taken from the plaintiff's complaint, ECF No. 1-1, and are accepted as true for purposes of the motion to dismiss.

## A.

In early 2020, Webster reached out to ESB with a business proposal: Would ESB buy a $12 million participation interest in a $56 million leasehold mortgage loan? Webster had issued the mortgage to finance the purchase of an office property called the American Metro Center. Compl. ¶ 12.

The underlying American Metro deal was sponsored by two of Webster's long-time clients, Avrohom and Shulamit Prager. Id. ¶ 15. The Pragers had worked with Birch Real Estate Services ("Birch") to separate the ownership of the American Metro Center's land and the office building thereon. Id. In 2019, Birch bought the entity that owned the land (the "Ground Owner"); meanwhile, the Pragers, through two other entities, bought the limited partnership that owned the improvements on the land (the "Ground Lessee"). Id. ¶ 16. The Ground Owner then entered into a 99-year lease with the Ground Lessee (the "Ground

2

Lease"), which required the Ground Lessee to pay property taxes and upkeep costs associated with the land. Id.

The Pragers spent $86.5 million to purchase the Ground Lessee. Id. ¶ 17. They financed that purchase through the Ground Lessee and two other investment vehicles (together, the "Borrowers") with the $56 million mortgage loan from Webster, which was collateralized by the leasehold interest in the American Metro office property (valued at $87.2 million). Id. The Pragers themselves would contribute the remaining $31 million, giving them "skin in the game" and aligning their interests with Webster's.[2] Id.

Webster's loan to the Borrowers (the "Webster Loan") contained several measures intended to ensure that the Borrowers continued to service the loan. Among other things, the Webster Loan required that the Borrowers pay all taxes associated with the property in a timely manner. Id. ¶ 23. The Webster Loan also incorporated the lease between the Ground Lessee and the Pragers (the "Primary Lease"), which automatically imposed a semiannual $125,000 cash sweep into a reserve account with Webster in the event the Ground Lessee's debt service coverage ratio fell below a certain level. Id. ¶ 25. The Primary Lease also required the

---

[2] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

3

Pragers to pay the Ground Lessee sufficient cash to bring it into minimum compliance with its debt-serving obligations. Id.

**B.**

While performing its due diligence, ESB noticed that the address for the Ground Owner in the Ground Lease was same as the Pragers' home address. Id. ¶ 26. ESB had made clear to Webster that it would not purchase the participation interest in the Webster Loan if the Pragers owned or controlled both the Ground Owner and Ground Lessee. The Ground Owner had separately taken out a $32.2 million loan from Argentic Real Estate Finance LLC (the "Argentic Loan"). Id. ¶ 18. Thus, if the Pragers had ownership stakes in both the Ground Lessee and the Ground Owner, then their personal equity interest in the American Metro property may have been far less than $31 million. And that would mean the loan-to-value ratio, and thus the risk of the loan, would be greater. Id. ¶ 27.

ESB questioned Webster about the relationship between the Pragers and the Ground Owner, but was allegedly assured by Eric Pelletier, a Webster employee, that "neither Shaya or [sic] his wife Shulamit own a position in the ground lessor/lease." Id. ¶ 30. Relying on that representation, ESB entered into the Participation Agreement with Webster to purchase a participation interest in the Webster Loan for $11,737,500. Id. ¶ 34.

4

The Participation Agreement provided several protections for ESB. For example, section 6(a) provided that, "[s]ubject to Section 11," Webster "shall have full and exclusive power and authority acting alone and in each instance without prior notice to or consent from [ESB] to do any and all things that in its sole discretion may be necessary or desirable in enforcing the obligations and liabilities" of the Borrowers. Decl. Fred Meagher Supp. Mot. to Dismiss ("Meagher Decl."), Ex. 1 ¶ 6(a), ECF No. 16-1.[3] Section 11 provides, among other things, that Webster would not "release" the Borrowers "from [their] obligations under any Loan Document" "without written notice to and consent from" ESB. Id. ¶ 11(e).

The Participation agreement also included several disclaimers. Specifically, Webster "ma[de] no representation or warranty ... of any kind with respect to [the Borrowers] and [their] financial condition." Id. ¶ 7(a). Webster also disclaimed "any liability, express or implied, ... for any failure or delay in exercising any right or power possessed by [Webster] under any of the Loan Documents except for actual losses, if any, suffered by [ESB] to the extent caused by or resulting from

---

[3] The Participation Agreement is incorporated by reference into the plaintiff's complaint because "the complaint relies heavily upon its terms and effect." Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016); see, e.g., Compl. ¶¶ 35-37, 44, 72-76.

the gross negligence or willful misconduct of [Webster]." Id. ¶ 7(b).

### C.

According to ESB, Webster "consistently mismanaged the Webster Loan" in violation of the Participation Agreement. Compl. ¶ 38. In early 2023, the Borrowers stopped paying their quarterly property taxes, and Webster made no effort to require them to resume doing so. Id. ¶ 39. ESB was troubled by the Borrowers' growing tax liability because that tax liability had priority over the Webster Loan. Id. ¶ 42.

At the same time, Webster relaxed the measures in the Primary Lease intended to ensure that the Borrowers adequately serviced their debt. For example, in early 2023, the Borrowers' debt servicing fell below the level prescribed by the Webster Loan. Id. ¶ 45. The Primary Lease therefore required (1) the Borrowers to sweep $125,000 into a reserve account with Webster and (2) the Pragers to deposit additional funds into that reserve account to bring the Borrowers back into compliance. Id. Instead, Webster informed ESB that it "would waive [the Borrowers'] violation for [fiscal year 2022]." Id. ¶ 46. Webster further informed ESB that it would "reset [the Borrowers'] annual [debt-service coverage ratio] covenant to 1.25x from 1.40x." Id. "Webster's decision to waive [the Borrowers'] [fiscal year] 2022 covenant violation" was based partly on

6

"Webster's relationship with the Sponsor, Shayya Prager, [who] continue[d] to be in good standing." Id.

### D.

ESB alleges that it first learned of the Borrowers' outstanding tax liability and Webster's purported mismanagement in March 2024. Id. ¶ 48. The news prompted ESB to review the documents it received from Webster before it entered into the Participation Agreement. Id. ¶ 51. During its reinvestigation, ESB discovered a single-page 2019 Form K-1 showing that Avrohom Prager owned 99 percent of the Ground Owner from September 9, 2019 through the end of that year. Id. The Form K-1 also showed that the Ground Owner paid Avrohom Prager more than $22 million of the $33.2 million Argentic Loan in 2019. Id. ¶ 52.

In July 2024, ESB informed Webster that it believed it had been fraudulently induced into purchasing the participation interest in the Webster Loan and demanded that Webster rescind the Participation Agreement. Webster declined, and ESB sued in New York state court. Webster then removed the action to this federal court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. ECF No. 1.

### II.

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550

7

U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). This Court accepts the allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). Although the Court must construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Iqbal, 556 U.S. at 678.

For purposes of a Rule 12(b)(6) motion, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). "[A] document not expressly incorporated by reference in the complaint" that "is nevertheless 'integral' to the complaint" is "a fair object of consideration on a motion to dismiss." Goel, 820 F.3d at 559. "A document is integral to the complaint where the complaint relies heavily upon its terms and effect." Id. "In most instances" in which the incorporation-by-reference "exception is recognized, the incorporated material is

8

a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls." Id.

### III.

### A.

ESB's first two claims are for fraudulent misrepresentation and mutual mistake. Rather than seeking damages, however, ESB seeks only rescission of the Participation Agreement. Pl.'s Mem. Opp'n Mot. to Dismiss ("Opp'n Mem.") 16, ECF No. 18 ("The Complaint clearly states a claim for rescission due to Webster's fraudulent misrepresentations."); id. ("ESB adequately pleaded, in the alternative, that Webster and ESB were mutually mistaken about the ownership of the Ground Owner," and "[w]here both parties to a contract are under a mistaken view about material facts, the contract is subject to rescission.").

"Rescission is an 'extraordinary' remedy," the effect of which "is to declare the contract void from its inception and to put or restore the parties to status quo." Ward v. TheLadders.com, Inc., 3 F. Supp. 3d 151, 164-65 (S.D.N.Y. 2014). Because recission is an equitable remedy, it "is to be invoked only when there is lacking [a] complete and adequate remedy at law and where the [s]tatus quo may be substantially restored." Rudman v. Cowles Commc'ns, Inc., 280 N.E.2d 867, 874 (N.Y. 1972). Where "damages appear adequate and it is impracticable to restore the [s]tatus quo," rescission is an inappropriate

9

remedy. Id.; see also Caremark, L.L.C. v. N.Y. Cancer & Blood Specialists, 740 F. Supp. 3d 340, 361-62 (S.D.N.Y. 2024) ("[I]t is well-settled that rescission is an equitable remedy which will not be granted unless [the] [p]laintiffs lack an adequate remedy at law.").

ESB's fraudulent-misrepresentation and mutual-mistake claims fail at the threshold because ESB fails to show that it lacks an adequate remedy at law. Although ESB's complaint contains conclusory allegations regarding the unavailability of a legal remedy, Compl. ¶¶ 64, 70, ESB never provides any "reason why damages would not be an adequate remedy," New Paradigm Software Corp. v. New Era of Networks, Inc., 107 F. Supp. 2d 325, 330, 332 (S.D.N.Y. 2000); see also Strategic Growth Int'l, Inc. v. RemoteMDx, Inc., No. 06-cv-3915, 2008 WL 4179235, at *6 (S.D.N.Y. Sept. 10, 2008) ("Even where fraudulent inducement is alleged, if there is an adequate remedy at law and the parties cannot be returned to the status quo ante, rescission is inappropriate.").

Because ESB has failed to plead why it lacks an adequate remedy at law, ESB's fraudulent-misrepresentation (Count I) and mutual-mistake (Count II) claims are **dismissed without prejudice.**

10

**B.**

In Count III, ESB alleges in the alternative that Webster breached the Participation Agreement. Under New York law, an action for breach of contract requires "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996). The parties dispute only the third and fourth elements of ESB's claim: breach and damages.

ESB alleges that Webster breached the Participation Agreement in two ways. First, ESB contends that Webster failed to take appropriate measures to compel the Borrowers to pay their property taxes, resulting in tax liens against the property. Compl. ¶¶ 39, 40. Second, ESB claims that Webster unilaterally released the Borrowers from the debt-service coverage ratio covenant. Id. ¶ 44.

The relevant provisions of the Participation Agreements are sections 6(a) and 11(e). Section 6(a) provides that

> Subject to Section 11 of this Agreement, Lender shall have full and exclusive power and authority acting alone and in each instance without prior notice to or consent from Participant, to do any and all things that in its sole discretion may be necessary or desirable in enforcing the obligations and liabilities of Borrower or any other obligor under the Loan Documents and in performing its obligations under the Loan Documents.

11

Meagher Decl., Ex. 1 ¶ 6(a). Section 11(e) provides that "without written notice to and consent from the Participant, Lender shall not ... release Borrower or any other obligor from all of such Person's obligations under any Loan Document." Id. ¶ 11(e).

Webster responds by pointing to section 7(b) of the Participation agreement, which provides that:

> Neither Lender nor any of its directors, officers, agents, employees, counsel or affiliates shall have any liability, express or implied, for any action taken or omitted to be taken by Lender or any such Person or for any failure or delay in exercising any right or power possessed by Lender under any of the Loan Documents <u>except for actual losses, if any, suffered by Participant to the extent caused by or resulting from the gross negligence or willful misconduct of Lender or any such Person.</u>

Id. § 7(b) (emphasis added). According to Webster, it is not enough for ESB to allege that Webster violated a term of the Participation Agreement — ESB must further allege that the breach was the result of gross negligence or willful misconduct and that the breach resulted in actual losses.

It is unnecessary to address whether Webster's alleged decision to allow the Borrowers to accumulate tax liability or to release the Borrowers unilaterally from the debt-service coverage ratio covenant amounted to gross negligence because ESB has failed to allege actual damages. The closest ESB comes to mentioning damages is in its opposition brief, when ESB claimed that "Webster's grossly negligent breaches of the Participation

12

Agreement damaged ESB by allowing the Borrower to incur a seven figure tax liability (with additional interest) and unilaterally permitting the Borrower and the Pragers to avoid their obligations under the Primary lease, reducing the cash the Borrower had available to pay the banks[,] ... [which] directly caused ESB to recover less from the mortgage than it otherwise would have." Opp'n Mem. 19-20.

The problem with this theory is that it is absent from the complaint. ESB alleges nowhere in the complaint that it did not receive any promised proceeds from the Webster Loan. The most the complaint asserts is that "ESB has been damaged in an amount to be determined at trial, but to exceed $500,000." Compl. ¶ 76. To plead actual damages, ESB must allege that Webster's breach resulted in a concrete loss; the complaint currently lacks any such allegation. See Constellation Power Source, Inc. v. Select Energy, Inc., 467 F. Supp. 2d 187, 215 (D. Conn. 2006) (under New York law, a contract that "expressly limits parties to recovery of 'direct actual damages'" prevents recovery based on a "purely hypothetical" "calculation").

Because ESB has failed to allege actual damages as required by section 7(b) of the Participation Agreement, ESB's breach-of-contract claim (Count III) claims is **dismissed without prejudice.**

13

## IV.

The Court has considered all the arguments raised by the parties. If any argument was not specifically addressed, it is either moot or without merit. For the foregoing reasons, the defendants' motion to dismiss is **granted.** Counts I, II, and III are **dismissed without prejudice.**

The Clerk is directed to close all open motions.

**SO ORDERED.**

**Dated:**      **New York, New York**
           **February 6, 2026**

_____
John G. Koeltl
**United States District Judge**

14